UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| U.M.C. GLOBAL INC., a Washington corporation,<br><br>                    Plaintiffs,<br><br>        v.<br><br>SIG SAUER INC., a Delaware corporation,<br><br>                    Defendant. | No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, through its attorneys Wright A. Noel and Patrick D. Moore, alleges:

## I.      INTRODUCTION

U.M.C. Global, Inc. ("UMCG") is a Washington electronics contract manufacturer that, at Sig Sauer's ("Sig") direction, committed to millions of dollars in non-cancelable purchases to keep Sig's best-selling pistol sight in production during the COVID-19 supply crisis. Sig assured UMCG the materials would be consumed within two years. They were not. Instead, Sig replaced its primary liaison, stopped providing demand forecasts, discontinued the top selling model, awarded the replacement to a competitor, and walked away—leaving UMCG holding over $850,000 in Sig-specific inventory that Sig is contractually obligated to purchase and substantial lost profits. Despite two years of direct requests to Sig, Sig has refused to honor its

COMPLAINT - 1

CARSON | NOEL
PLLC

20 Sixth Avenue NE, Issaquah, WA 98027
P. 425.837.4717  |  F. 425.837.5396

obligations under the parties' Manufacturing Agreement. UMCG brings this action to recover the cost of the inventory Sig authorized, lost profits, together with interest and attorneys' fees.

## II.    PARTIES, JURISDICTION, AND VENUE

1.    At all times material, Plaintiff U.M.C. Global was a Washington corporation with its principal place of business in Woodinville, Washington.

2.    At all times material, Defendant Sig Sauer Inc., was a Delaware corporation with its principal place of business in Newington, New Hampshire.

3.    This Court has subject matter jurisdiction under 28 U.S.C. Section 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. UMCG is a citizen of Washington. Sig is a citizen of Delaware and New Hampshire.

4.    Venue is proper in this District under 28 U.S.C. Section 1391(b) and pursuant to Section 11.7 of the parties' Manufacturing Agreement, in which the parties consented to the exclusive jurisdiction of the state and federal courts in King County, Washington. King County is within the Western District of Washington.

## III.    FACTUAL BACKGROUND

### A.    The Parties and Their Relationship

5.    U.M.C. Global, Inc. manufactures custom electronic and electro-mechanical devices, with a full-service product development pipeline from concept creation through mass production. Its clients include firms like Onan, Novartis and GE Healthcare.

6.    In 2015, UMCG became an approved supplier of printed circuit board assemblies ("PCBAs") to Sig Sauer Inc. a firearms and firearms accessories firm. The printed circuit board assemblies were use in products developed by Sig's "Electro Optics" division. The Electro Optics division develops and produces rifle and pistol optical sights. The division is based in the Wilsonville, Oregon area.

COMPLAINT - 2



20 Sixth Avenue NE, Issaquah, WA 98027
P. 425.837.4717   |   F. 425.837.5396

7.    In 2018, UMCG began manufacturing several models of "red dot" gunsights marketed as part of Sig's "ROMEO" family of products. Sig developed these products with the assistance of UMCG, who provided prototyping, production, and reliability engineering support. UMCG manufactured the PCBAs and subassemblies at its facility in Penang, Malaysia. Sig completed final assembly at its facility in Oregon.

8.    Among these products was the "ROMEO Zero" red-dot sight, an ultracompact optic for mounting on a pistol. The ROMEO Zero product line was highly successful, with demand increasing to 17,000 units per month and projections as high as 37,000 units per month.

**B.    The Manufacturing Agreement**

9.    On or about March 5, 2020, UMCG and Sig entered into a written Manufacturing Agreement (the "Agreement"). A copy of the Agreement is attached hereto as **Exhibit A**. The Agreement governed UMCG's procurement of materials for and manufacturing of Sig's products and superseded all prior agreements between the parties.

10.    Under the Agreement, Sig was required to provide UMCG with rolling twelve-month demand forecasts on a quarterly basis (a "Forecast"). Sig's Forecasts and Purchase Orders constituted authorization for UMCG to procure the components, materials, and supplies necessary to manufacture Sig's products (the "Inventory").

11.    The Agreement provides that Sig "will be financially responsible for all Inventory and Special Inventory purchased by UMCG under this Agreement."

12.    In the event of decreased demand, Sig was required to accept all work-in-process, finished product, and all materials in quantities greater than a sixty-day supply, for delivery and full payment.

13.    Sig could not cancel any accepted Purchase Order without UMCG's prior written approval.

COMPLAINT - 3

CARSON | NOEL
PLLC

20 Sixth Avenue NE, Issaquah, WA 98027
P. 425.837.4717  |  F. 425.837.5396

14.    Upon cancellation, Sig was required to pay UMCG 100% of the contract price for finished products, 110% of the cost of non-returnable Inventory, 105% of the cost of non-cancelable Inventory on order, vendor cancellation charges, and labor and equipment costs.

15.    Sig agreed to pay 1.5% monthly interest on all late payments without regard to cause.

**C.    The COVID Supply Crisis and Sig's Direction to Pre-Purchase**

16.    In 2020 and 2021, the worldwide electronic component supply chain was severely disrupted by the COVID-19 pandemic. Components custom and specific to Sig went on allocation and became unavailable in the volumes needed to support ROMEO Zero production.

17.    As described below, based on Sig's Forecasts, Purchase Orders, and written email direction from Smith and York, UMCG entered into non-cancelable, non-returnable purchase agreements with its component suppliers to gather inventory to support the ROMEO Zero product lines (the "Sig Inventory"). The purchases included ATtiny microcontrollers, custom LED emitters from Jenoptik manufactured exclusively for Sig products and not usable by any other customer, STMicro microcontrollers, and accelerometers.

18.    As of August 2020, Sig had backorders of approximately 25,000 units for the 3MOA (minute of arc) model and 16,000 units for the 6MOA model.

19.    On December 11, 2020, Sig provided UMCG with a Forecast projecting demand across the ROMEO Zero product family of up to 37,000 units per month when all planned models reached production in 2021.

20.    Beginning in February 2021, Sig's Operations Manager, Scott Smith, acting at the direction of Sig's President of Electro Optics, Andy York, directed UMCG to secure component supply by purchasing directly from manufacturers and distributors.

21.    On February 16, 2021, Smith emailed UMCG with copies to York, reporting annual demand of approximately 600,000 to 800,000 microcontroller units. At York's direction,

COMPLAINT - 4

Smith asked whether UMCG could purchase one to two million units directly from the manufacturer to ensure supply.

22.    On February 17, 2021, Microchip Technology Inc., the manufacturer of the ATtiny microcontroller, set up a direct purchasing account for UMCG at Sig's direction. Microchip reported lead times of 25 to 42 weeks for the candidate components.

23.    On February 18, 2021, Smith requested a comprehensive inventory summary from UMCG for a planning exercise for York. Smith stated that Sig wanted "a line of sight to approximately 500,000 MCUs/accelerometers" for the balance of 2021, from which to plan orders for 2022.

24.    On February 24, 2021, UMCG provided the requested inventory summary showing approximately 711,000 microcontroller units in the procurement pipeline. The following day, UMCG placed an order for approximately 500,000 additional ATtiny microcontrollers, consistent with Sig's direction.

25.    Had UMCG not ordered the Sig Inventory, Sig's product line would have been shut down for over a year for lack of these vital components.

26.    Sig executives assured UMCG that the Sig Inventory would be consumed within two years. This included plans to consume the Sig Inventory in two new models in the ROMEO Zero product line, the "RZ Pro" and the "RZR."

**D.    Sig Abandons UMCG**

27.    In July 2021, Smith was reassigned within Sig and relocated to Georgia. In his final communication with UMCG, Smith introduced his replacement, Steve Jedan, as Sig's new Director of Supply Chain. In that same email, Smith acknowledged that the market had slowed and that retail sell-through had "dropped dramatically."

28.    After Smith's departure, Jedan failed to provide UMCG with demand projections or guidance on volumes as required by the Agreement. Communication between Sig and UMCG deteriorated, and UMCG could only react to volume decreases as they occurred.

COMPLAINT - 5

29.    UMCG was never awarded the RZ Pro or the RZR, which went to other Sig suppliers.

30.    By 2024, Sig had discontinued the ROMEO Zero legacy model and sourced its replacement, the "Romeo RZ and RZR," from an alternate supplier.

31.    Sig did not send UMCG a written notice of termination of the Agreement. Sig did not send UMCG , formal notice of the discontinuation of the Romeo Zero Legacy, formal cancellation of any accepted Purchase Order, or modification of pertinent forecasts. Sig did not obtain UMCG's prior written approval for cancellation.

**E.    The Excess Inventory**

32.    Since the time of purchase, approximately $3.4 million of the original Sig Inventory has been consumed through residual production.

33.    As of September 2024, UMCG held 78 line-items of excess, Sig-specific components with a total value of $1,120,949.78. The largest items include ATtiny microcontrollers ($428,970), Jenoptik LED emitters in three variants ($346,841), and STMicro microcontrollers ($102,799).

34.    The Jenoptik LED emitters—approximately 31% of the total excess by value—were manufactured exclusively for Sig products and cannot be sold to any other customer.

35.    This remainder (the "Excess Inventory") exists because Sig directed the purchases, assured UMCG the materials would be consumed, stopped ordering, discontinued the products, sourced replacements from a competitor, and refused to pay for the materials it directed UMCG to buy.

**F.    UMCG Demands Payment; Sig Deflects**

36.    On August 24, 2024, UMCG's President, Greg Jenkins, emailed York disclosing the full scope of the Excess Inventory---approximately $1 million in components that Sig was obligated to purchase under the Agreement.

COMPLAINT - 6

CARSON | NOEL
PLLC

20 Sixth Avenue NE, Issaquah, WA 98027
P. 425.837.4717  |  F. 425.837.5396

37.    York's sole response was to assign Jedan to verify the Excess Inventory. Jedan and a colleague completed verification of the quantities and values in January 2025.

38.    Following verification, Sig purchased approximately $300,000 of the Excess Inventory but ignored the remainder.

39.    On June 27, 2025, Jenkins emailed York again, noting that approximately one year had passed with little progress. Jenkins stated that Sig was legally obligated under the Agreement to purchase the remaining Excess Inventory, that UMCG had been carrying the Excess Inventory since 2020 well beyond the projected two-year consumption window, and that UMCG wished to resolve the matter without legal action. Sig did not substantively respond.

40.    After Sig's partial purchase of approximately $300,000, the remaining Excess Inventory stands at approximately $840,000, and $15,000.00 in finished goods. The Excess Inventory and finished goods are brand new and stored in climate-controlled conditions.

41.    UMCG has carried the Excess Inventory for over four years, and seeks full reimbursement and damages, including interest, as to the greatest extent available under the Agreement.

### IV.    CAUSES OF ACTION

### First Cause of Action: Breach of Contract

42.    The Agreement is a valid and enforceable contract between UMCG and Sig.

43.    UMCG performed its obligations under the Agreement. UMCG procured Inventory in accordance with Sig's Forecasts, Purchase Orders, and written authorizations. UMCG manufactured and delivered products as ordered. UMCG maintained the Excess Inventory in brand-new, climate-controlled condition.

44.    Sig breached the Agreement in one or more of the following respects:

(a) Sig failed and refused to pay for the materials purchased by UMCG under the Agreement, in violation of Section 2.3b, which provides that Sig "will be financially

COMPLAINT - 7

responsible for all Inventory and Special Inventory purchased by UMCG under this Agreement";

(b) Sig failed to accept all work-in-process, finished product, and materials in quantities greater than a sixty-day supply for delivery and full payment upon decreased demand, in violation of Section 3.3;

(c) Sig effectively cancelled its purchase obligations---by discontinuing the ROMEO Zero product line, sourcing its replacement from an alternate supplier, and ceasing to issue Purchase Orders or Forecasts---without obtaining UMCG's prior written approval and without paying the amounts required by Section 3.4;

(d) Sig failed to provide UMCG with rolling quarterly Forecasts after December 2020, in violation of Section 2.1, depriving UMCG of the information necessary to manage its procurement and inventory levels; and,

(e) Such other breaches as may be discovered during discovery in this matter.

45.    As a direct and proximate result of Sig's breaches, UMCG has been damaged in an amount to be proven at trial, including but not limited to, costs of inventory, finished goods, carrying costs, and lost profits.

## Second Cause of Action: Promissory Estoppel

46.    In the alternative, and to the extent the Agreement does not govern any portion of UMCG's claims, UMCG states this claim for promissory estoppel.

47.    Sig, through Smith and York, made clear and definite promises that Sig's demand would consume the materials UMCG was directed to procure, and that the materials would be consumed within approximately two years. Sig provided Forecasts projecting demand of up to 37,000 units per month and directed UMCG to secure component supply at volumes consistent with those projections.

COMPLAINT - 8

CARSON NOEL
PLLC

20 Sixth Avenue NE, Issaquah, WA 98027
P. 425.837.4717  |  F. 425.837.5396

48.     UMCG reasonably and foreseeably relied on Sig's promises and Forecasts by entering into non-cancelable, non-returnable purchase agreements with its component suppliers.

49.     UMCG has been damaged because of its reliance in an amount to be proven at trial.

### V.      JURY DEMAND

50.     Plaintiff demands that this case be tried to a jury.

### VI.     PRAYER FOR RELIEF

Based on the foregoing allegations, UMCG respectfully requests a judgment in its favor awarding the following relief:

A.      Actual damages in an amount to be established at trial.

B.      Prejudgment interest to the extent allowed by law or contract.

C.      Attorneys' fees and costs to the extent allowed by law or contract.

D.      Such other relief at law or in equity as may be warranted by the facts as proved at trial or otherwise.

COMPLAINT - 9

CARSON | NOEL
PLLC

20 Sixth Avenue NE, Issaquah, WA 98027
P. 425.395.7786  |  F. 425.837.5396

DATED: May 13, 2026

**CARSON & NOEL, PLLC**
By: /s/ *Wright A. Noel*

Wright A. Noel, WSBA No. 25264
Patrick D. Moore, WSBA No. 54177
20 Sixth Avenue NE
Issaquah, WA 98027
Telephone: (425) 395-7786
Email: wright@carsonnoel.com
Email: patrick@carsonnoel.com

*Attorneys for Plaintiff U.M.C. Global Inc.*

COMPLAINT - 10

# EXHIBIT A

# Manufacturing Agreement
## Sig Sauer Inc / UMC Global Inc

WHEREAS, Sig Sauer, hereafter referred to "(Customer)" desires to purchase, and UMC Global Inc, hereafter referred to as "(UMCG)" desires to manufacture and sell products as specified in this Agreement. Product specific requirements along with specific business terms and conditions will be mutually agreed to and documented by an addendum to this Agreement.

WHEREAS, UMCG has developed processes and practices for manufacturing products for different electronic applications and at Customer's request desires to manufacture Customer's products in accordance with Customer's specifications.

NOW THEREFORE, IN CONSIDERATION OF the mutual promises and covenants set forth in this Agreement, the parties agree as follows:

## 1.0 WORK, LICENSE

It is the intent of the parties that this Agreement and any attached Exhibits shall prevail over the terms and conditions of any Purchase Order or additional materials. In the event of a conflict between the terms of this Agreement and the terms contained in any such Purchase Order or additional materials, terms of this Agreement shall be controlling.

UMCG agrees to use best commercially reasonable efforts to perform the Work pursuant to Purchase Orders or changes thereto issued by Customer and accepted by UMCG. "Work" shall mean UMCG obligations to procure components, materials, equipment and other supplies and to manufacture, assemble, and test, Customer's products (hereinafter "Products") pursuant to Customer's specifications set forth in Exhibit A ("Specifications").
Subject to the terms and conditions of this Agreement, Customer hereby grants UMCG a non-exclusive, non-sub licensable, non-transferable limited license to internally use, at UMCG'S place of business, all of Customer's patents, trade secrets and other intellectual property solely to perform the Work.

## 2.0 FORECASTS, ORDERS, MATERIAL PROCUREMENT

### 2.1 Forecast

Customer shall provide UMCG, on a quarterly basis, a non-binding, except as set forth in Section 2.3b and 3.4, rolling twelve (12) month Product order Forecast ("Forecast"). UMCG shall view all such Forecasts as Confidential Information (as defined in Section 11). Forecast will indicate which products are released to production and have upside flexibility as defined in Section 3.3.

### 2.2 Purchase Orders

Customer will issue orders for the Products in accordance with the order forms ("Purchase Orders") set forth in Exhibit B. Purchase Orders shall be deemed accepted by UMCG upon receipt, provided however that UMCG may reject any order that represents a volume deviation from Customer's product Forecast delivered pursuant to UMCG pursuant to Section 2.1. UMCG shall notify Customer of rejection of any Purchase Order within five (5) working days of receipt of such order. The parties agree that the terms and conditions contained in this Agreement shall prevail over any terms and conditions of any Purchase Order, acknowledgment form or other instrument.

### 2.3a. Material Procurement

Subject to the notices set forth in Section 2.4, UMCG agrees to purchase any components and parts ("Materials") for the manufacture of the Products in accordance with Customer's approved vendor list ("AVL") set forth in Exhibit C. To use other vendors of Materials, UMCG must obtain Customer's prior written consent, which consent shall be provided within five (5) days and, in any event, shall not be unreasonably withheld or delayed.

### 2.3b Inventory

Customer's accepted Forecast and Purchase Orders will constitute authorization for UMCG to procure, using standard purchasing practices, the components, materials and supplies necessary for the manufacture of Products ("Inventory") covered by such Purchase Orders and Forecast. Following release to production, customer authorizes UMCG to manufacture and maintain an additional ninety (90) days unit buffer stock, beyond open purchase orders, to be used for unplanned demand or the replacement of failed units per Sections 6.1 and 6.2.

EvB_VonBosse          1

In addition, Customer authorizes UMCG to purchase, in amounts beyond the amount necessary to fill accepted Purchase Orders, the components, materials, and supplies: (i) with lead times greater than ninety (90) days at the time the order is placed ("Long Lead Time Components") plus 30 days to account for the order, shipment, receipt and manufacturing time and, (ii) purchased in quantities above the required amount in order to achieve price targets ("Economic Order Inventory"), and (iii) purchased in excess of requirements because of minimum lot sizes available from manufacturers ("Minimum Order Inventory"). Together these are called "Special Inventory". Special inventory shall be limited to the greater of Minimum Order Inventory or the next 90 calendar days, beyond open purchase orders, of requirements.

UMCG may purchase Long Lead Time Components sufficient to meet all deliveries under the Purchase Orders and Product Forecast in effect at the time the order with is placed, and may reasonably purchase Minimum Order Inventory even if greater than the amount necessary to meet Purchase Orders and Product Forecast and terms defined in Section 3.3. Economic Order Inventory shall be purchased by UMCG at its discretion based on generally accepted industry practices. UMCG may, from time to time, hold Long Lead Time Components and finished goods in inventory to increase customer flexibility. The components and quantities of all such inventory, including all Non-Cancelable, Non-returnable Items, will be documented by UMCG.

Customer will be financially responsible for all Inventory and Special Inventory purchased by UMCG under this Agreement. UMCG' production factory will utilize all its commercially reasonable efforts to minimize the material exposure. The maximum WIP material exposure for released product shall be less than or equal to 100% of the unshipped monthly forecast.

### 2.4a Lead Time Materials Records
UMCG will purchase specified quantities of long lead time material and Customer unique material as authorized by Customer in advance and in writing. UMCG will compile and maintain records concerning long lead time materials and provide these records upon request of the Customer.

### 2.4b Capacity Report
UMCG shall define manufacturing capacity for each Product and/or family of Products. UMCG will also provide supply chain capacity information (collectively "Capacity Information") for unique, custom parts as mutually agreed. Capacity Information along with up-to-date information on UMCG' manufacturing capacity and cycle time schedule will be provided to Customer on at least a bi-monthly basis or as requested by Customer.

### 2.4c Operation Reports
During the term of this Agreement, UMCG agrees to monitor lead times and cycle times for the various Products as broken down into the following major categories: Order processing cycle time, Material lead time, Manufacturing lead time, and shipping lead time.
UMCG agrees to use it best efforts work with Customer to develop strategies which will lead to ongoing reductions in lead times and cycle times for the various categories. Reports and pertinent information will be provided to Customer as requested and will include the details and results of the implementation of such strategies.

## 3.0 SHIPMENTS, SCHEDULE CHANGE, CANCELLATION

### 3.1 Shipments
UMCG agrees that all Products delivered pursuant to the terms of this Agreement shall be packaged and prepared for shipment in a manner which (i) follows the requirements set forth in Customer's Product Documentation, or (ii) follows good commercial practice, (iii) is acceptable to common carriers for shipment, and (iv) is adequate to ensure safe arrival. Each shipment shall be accompanied by a packing slip that includes Customer's part numbers, Purchase Order number, Quantity shipped, and Lot Traceability.

### 3.2 Delivery
UMCG acknowledges and agrees that UMCG shall use its commercially reasonable efforts to meet the target goal of 100% on-time delivery to the Customer (defined as the delivery point of the product in the applicable Purchase Order) based on the acknowledged delivery due date. This section, as appropriate, may be modified by an addendum to reflect specific Product requirements. All shipments shall be F.O.B. origin (UMCG' dock). Title and risk of loss shall pass to Customer upon UMCG's tendered delivery to the common carrier or Customer's designee.

### 3.2a Delays
Upon learning of any potential delivery delays, UMCG will notify Customer within three (3) business days as to the cause and extent of such delay. If UMCG fails to make deliveries as per agreed delivery schedules and dates and such failure is caused by UMCG, UMCG will, at no additional cost to Customer, employ accelerated measures such as material expediting fees, premium transportation costs, or labor overtime required to meet the specified delivery schedule or minimize the lateness of deliveries.

EVB–VanBosse    2

**3.3 Quantity Increases and Shipment Schedule Changes**
Prior to the date that is 60 days before a shipment date set forth in any accepted Forecast, Customer may make any changes to the items included in such Forecast, such changes including, changes in shipment date or quantity. Thereafter, Customer may (i) increase the quantity of Products or (ii) reschedule the quantity of Products and their shipment date within a period of 60 days from the date of manufacture.

Any Purchase Order quantities increased or rescheduled pursuant to this Section may not be subsequently increased or rescheduled without the prior written approval of UMCG. UMCG shall use reasonable commercial efforts to meet any quantity increases requested by Customer. In the event, that UMCG is unable to meet any such increase requests, UMCG shall within five (5) business days of receiving Customer request for quantity increase notify Customer, in writing, of UMCG inability to meet such quantity increase with key constraints defined. UMCG will consider all Forecast change requests, regardless of above constraints, to determine the solutions (normal commercial practices) available to meet the request and make these options available to the customer.
In the event Customer reschedules deliveries and UMCG inventory exceeds a 60 day target supply, Customer will pay 1.5% carrying cost on the quantity greater than the 60 day supply. In the event of decreased demand customer will accept all WIP, finished product, and all materials quantity greater than the 60 day supply for delivery and full payment.

**3.4 Cancellation**
Customer may not cancel any accepted Purchase order without UMCG' prior written approval, such approval not to be unreasonably withheld. If the parties agree upon a cancellation, Customer will pay UMCG for Products, Inventory, and Special Inventory affected by the cancellation as follows: (i) 100% of the contract price for all finished Products in UMCG' possession, (ii) 110% of the cost of all Inventory and Special Inventory in UMCG' possession and not returnable to the vendor or usable for other customers, whether in raw form or work in process, less the salvage value thereof, (iii) 105% of the cost of all Inventory and Special Inventory on order and not cancelable, (iv) any vendor cancellation charges incurred with respect to Inventory and Special Inventory accepted for cancellation or return by the vendor, and (v) expenses incurred by UMCG related to labor and equipment specifically put in place to support Customer's purchase orders. UMCG shall provide to Customer within thirty (30) business days a detailed invoice of the cost of cancellation. Customer shall pay the amount set fort in such invoice thirty (30) days after receipt of such invoice.
UMCG will use reasonable commercial efforts to return unused Inventory and Special Inventory and to cancel pending orders for such inventory, and to otherwise mitigate the amounts payable by Customer.

**4.0 ENGINEERING CHANGES**

Customer may request, in writing, that UMCG incorporate engineering changes into the Product. Such request will include a description of the proposed engineering change sufficient to permit UMCG to evaluate its feasibility and cost. UMCG' evaluation shall be in writing and shall state the costs and time of implementation and the impact on the delivery schedule and pricing of the Product. UMCG shall provide such evaluation within seven (7) business days after receipt of Customer request for engineering change. Customer may request three (3) day response on critical ECO's to expedite response.

UMCG will not be obligated to proceed with the engineering change until the parties have agreed upon the changes to the Specifications, delivery schedule and Product pricing and upon the implementation costs to be borne by Customer including, without limitation, the cost of Inventory and Special Inventory on-hand and on-order that becomes obsolete.

**5.0 TOOLING, NON-RECURRING EXPENSES, SOFTWARE, AND SYSTEMS INFRASTRUCTURE**

**5.1** UMCG shall provide non-Product specific tooling at its expense, including, but not limited to assembly equipment, ICT testers, material handling equipment, general scopes and analyzers, and inspection equipment. Customer shall pay for or obtain and consign to UMCG any Product specific tooling and other reasonably necessary non-recurring expenses, to be set forth in UMCG' quotation, including, but not limited to functional test equipment and specialized test and measurement equipment. All software, which Customer provides to UMCG, is and shall remain the property of Customer. Customer grants UMCG a license to copy, modify and use such software required to perform UMCG' obligations under this Agreement. All software developed by UMCG to support the process tooling or otherwise shall be and remain the property of UMCG. UMCG shall hold Customer Property at its own risk and shall not modify the property without the written permission of Customer. UMCG will use customer property only for purposes of this Agreement. Upon Customer's request, UMCG shall redeliver the property to Customer in the same condition as originally received by UMCG with the exception of reasonable wear and tear. In the event the property is lost, damaged or destroyed, UMCG' liability for the property is limited to the book value of the property.

**5.2 Systems Development, Deployment and Operations**
UMCG agrees to work with CUSTOMER to support the development, deployment, and ongoing operations of systems at UMCG as required to support the manufacturing and product fulfillment processes.

EV8 –VonBosse    3

## 6.0 PRODUCT ACCEPTANCE, WARRANTIES, AND RETURN SERVICES

### 6.1 Product Acceptance

The Products delivered by UMCG will be inspected and tested as required by Customer within thirty (30) days of Customers receipt of such Products. The Product test shall be based on, but is not limited to, (a) any material failure to meet any applicable specifications and/or written representations and warranties made by UMCG or (b) any repeated inability to perform, without interruption, in material compliance with the performance characteristics described in the Specifications. If the Products are found to be defective in material or workmanship, Customer has the right to reject such Products during said period. Products not rejected during said period will be deemed accepted. Customer may return defective Products after obtaining a return material authorization number from UMCG to be displayed on the shipping container and completing a failure report. Rejected Products will be either repaired or replaced at UMCG' option and cost within sixty (60) business days. UMCG will replace failed product within ten (10) business days when possible using production or buffer inventory. If UMCG fails to repair or replace such Product within such ten (10) business day period, then Customer shall have the right, without liability, to require expedited shipping of the conforming Product at UMCG' sole cost. Both parties agree to work in good faith to implement Returned Product Services per Section 6.3 such that the replacement time is set to ten (10) business days.

### 6.2 Express Limited Warranty

UMCG warrants that: (i) the Products will conform to Customer's applicable Specifications; (ii) unless otherwise agreed the Products shall be free from material and workmanship defects for a period of (180) days from the UMCG manufacture date; (iii) the Products shall be free and clear of all liens and encumbrances and that UMCG will convey good and marketable title to such Product. This express limited warranty does not apply to (a) materials consigned or supplied by Customer to UMCG; (b) defects resulting from Customer's Specifications or the design of the Products; or (c) Product that has been abused, damaged, altered or misused by any person or entity after title passes to Customer.

With respect to first articles, prototypes, pre-production units or test units manufactured solely for Customer, UMCG makes no representations or warranties whatsoever.

In the event that any Product manufactured shall not be in conformity with the foregoing warranties, UMCG shall, at UMCG' sole expense, replace, repair or correct such Product within sixty (60) business days of receipt of such defective Product. UMCG will replace failed product within ten (10) business days when possible using production or buffer inventory. UMCG shall waive any charges to Customer in order to effect the replacement of such defective Products.

### 6.3 Returned Product Services

UMCG will work with CUSTOMER to establish returned product services including (but not limited to): (1) In-warranty repair, (2) out of warranty repair, (3) product upgrades, (4) stock rotation programs, (5) and failure analysis. The specific scope of work and service level expectation for these services, as well as the pricing of these shall be set forth in Exhibit D.

UMCG MAKES NO OTHER WARRANTIES OR CONDITIONS ON THE PRODUCTS, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR COMMUNICATION WITH CUSTOMER, AND UMCG SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## 7.0 PAYMENT TERMS, ADDITIONAL COSTS AND PRICE

### 7.1 Price and Payment Terms

The price for Products to be manufactured will be set through Purchase Orders issued by Customer and accepted by UMCG. The current prices and terms are set forth in UMCG's product quotation (Exhibit E) and may be changed from time to time by UMCG. All prices quoted are exclusive of federal, state and local excise, sales, use and similar taxes, and any duties, and Customer shall be responsible for all such items. Payment for any Products, services or other costs to be paid by Customer hereunder are due thirty (30) days net from the date of shipment and shall be in U.S. currency. Customer agrees to pay 1.5% monthly interest on all late payments without regard to cause. Furthermore, if Customer is late with payments, or UMCG has reasonable cause to believe Customer may not be able to pay, UMCG may require prepayment or delay shipments or suspend work until assurances of payment satisfactory to UMCG are received.

### 7.2 Additional Costs

Customer is responsible for (a) any expediting charges reasonably necessary because of a change in Customer's requirements which charges are pre-approved, (b) any overtime or downtime charges incurred as a result of delays in the normal production or interruption in the workflow process and caused by: (1) Customer's change in the Specifications; or (2) Customer's failure to provide sufficient quantities or a reasonable quality level of consigned materials where applicable to sustain the production schedule. No expedite fees are to be charged in cases where UMCG is solely or jointly responsible for such delay.

EvB-VonBosse   4

**7.3 Price Changes**
The price of Products to Customer may be increased by UMCG if increases after good faith negotiation, the parties agree in writing to such.

**7.4 Cost Reductions**
UMCG agrees to seek ways to reduce the cost of manufacturing Products by methods such as elimination of components, obtaining alternate sources of materials, redefinition of specifications, and improved assembly or test methods. Customer would receive any cost reductions identified by Customer, implemented at the next price update.

## 8.0 TERM AND TERMINATION

**8.1 Term**
The term of this Agreement shall commence on the Effective Date and shall continue 2 years unless terminated as provided in Section 8.2. After the expiration of the initial term hereunder (unless this Agreement has been terminated) this Agreement shall automatically renew for separate but successive one-year terms.

**8.2 Termination**
This Agreement may be terminated by either party (a) for any reason upon thirty (30) days written notice to the other party, or (b) if the other party defaults in any payment to the terminating party and such default continues without a cure for a period of thirty (30) days after the delivery of written notice thereof by the terminating party to the other party, (c) if the other party defaults in the performance of any other material term or condition of this Agreement and such default continues un-remedied for a period of thirty (30) days after the delivery of written notice thereof by the terminating party to the other party. Termination of this Agreement for any reason shall not affect the obligations of either party that exist as of the date of termination. Upon termination due to a default by Customer or a breach by Customer of its obligations, Customer shall be responsible for the finished Products, Inventory, and Special Inventory in existence at the date of termination; otherwise Customer shall only be responsible for finished Products. Notwithstanding termination or expiration of this Agreement, Sections 6.2, 8.0, 9.0, and 11 shall survive said termination or expiration.

## 9.0 LIABILITY LIMITATION

**9.1 Patents, Copyrights, Trade Secrets, Other Proprietary Rights.**
(a) UMCG shall defend or settle at its expense any claim or suit, including without limitation any third-party claim or suit against Customer or its affiliates, directors, officers, agents, employees to the fullest extent permitted by law arising out of or in connection with any claim that the UMCG manufacturing process violates the intellectual property rights of a third party

(b) Customer shall defend or settle at its expense any claim or suit ("Action"), including without limitation any third-party claim or suit against UMCG arising out of or in connection with any claim that the Product violates the intellectual property rights of a third party.

Each Party's ("Indemnitor") obligation to indemnify and hold harmless the other Party ("Indemnitee") from and against any and all damages, costs, liabilities and attorneys' fees, incurred in defending and/or resolving such Action; provided that: (i) the Indemnitor is promptly notified in writing of such Action, (ii) the Indemnitor shall have the sole control of the defense and/or settlement thereof, (iii) the Indemnitee furnishes to the Indemnitor, on request, information available to the Indemnitee for such defense, and (iv) the Indemnitee cooperates in any defense and/or settlement thereof as long as the Indemnitor pays all of the Indemnitee's reasonable out of pocket expenses and attorneys' fees. The Indemnitee shall not admit any such Action or any allegations made in such Action without the prior written consent of the Indemnitor.

THE FOREGOING STATES THE ENTIRE LIABILITY OF THE PARTIES TO EACH OTHER CONCERNING INFRINGEMENT OF PATENT, COPYRIGHT, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHTS.

**9.2 Product Liability**
UMCG agrees that, if notified promptly in writing and given sole control of the defense and all related settlement negotiations, it will defend Customer from any claim or action and will hold Customer harmless from any loss, damage or injury, including death, which arises from any alleged manufacturing defect of any Products.

*EvB – VonBosse*    5

**9.3 No Other Liability**
EXCEPT FOR THE EXPRESS WARRANTIES CREATED UNDER THIS AGREEMENT AND EXCEPT AS SET FORTH IN THIS SECTION 9 AND A BREACH OF CONFIDENTIALLY IN SECTION 11, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY KIND OR NATURE ARISING OUT OF THIS AGREEMENT OR THE SALE OF PRODUCTS, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT (INCLUDING THE POSSIBILITY OF NEGLIGENCE OR STRICT LIABILITY), OR OTHERWISE, EVEN IF THE PARTY HAS BEEN WARNED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE, AND EVEN IF ANY OF THE LIMITED REMEDIES IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE.

## 10. CONFIDENTIALITY.

**Each party ("Receiving Party") agrees to keep confidential and not disclose or use except in performance** of its obligations under this Agreement, confidential or proprietary information related to the other party's ("Disclosing Party") technology or business that the Receiving Party learns in connection with this Agreement and any other information received from the other, including without limitation, to the extent previously, currently or subsequently disclosed to the Receiving Party hereunder or otherwise: information relating to products or technology of the Disclosing Party or the properties, composition, structure, use or processing thereof, or systems therefore, or to the Disclosing Party's business (including, without limitation, computer programs, code, algorithms, schematics, data, hard ware design, part list, vendor lists, know-how, processes, ideas, customer information, inventions (whether patentable or not), names and expertise of employees and consultants, all information relating to customers and customer transactions and other technical, business, financial, customer and product development plans, forecasts, strategies and information (all of the foregoing, "Confidential Information"). Neither party shall disclose the terms of this Agreement to any third party, without the prior written consent of the other party. Each party shall use reasonable precautions to protect the other's Confidential Information and employ at least those precautions that such party employs to protect its own confidential or proprietary information. "Confidential Information" shall not include information the Receiving Party can document (a) is in or (through no improper action or inaction by the Receiving Party or any affiliate, agent or employee) enters the public domain (and is readily available without substantial effort), or (b) was rightfully in its possession or known by it prior to receipt from the Disclosing Party, or (c) was rightfully disclosed to it by another person without restriction, or (d) was independently developed by it by persons without access to such information and without use of any Confidential Information of the Disclosing Party. Each party, with prior written notice to the Disclosing Party, may disclose such Confidential Information to the minimum extent possible that is required to be disclosed to a governmental entity or agency in connection with seeking any governmental or regulatory approval, or pursuant to the lawful requirement or request of a governmental entity or agency (including a court order or subpoena), provided that reasonable measures are taken to guard against further disclosure, including without limitation, seeking appropriate confidential treatment or a protective order, or assisting the other party to do so.

## 11.0 MISCELLANEOUS

**11.1 Entire Agreement**
This Agreement constitutes the entire agreement between the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements and understandings between the parties relating to such transactions. Customer shall hold the existence and terms of this Agreement confidential, unless it obtains UMCG' express written consent otherwise. In all respects, this Agreement shall govern, and any other documents including, without limitation, preprinted terms and conditions on Customer's Purchase Orders shall be of no effect.

**11.2 Notice**
Notices under this Agreement shall be sufficient only if in writing and transmitted via email (with confirmation of receipt), personally delivered, delivered by a major commercial rapid delivery courier service or mailed, postage or charges prepaid, by certified or registered mail, return receipt requested to a party at its addresses set forth on the first page above (attn: Chief Legal Officer) or as amended by notice pursuant to this Section. If not received sooner, notice by mail shall be deemed received five (5) days after deposit in the U.S. mail.

**11.3 Amendments**
This Agreement may be amended only by written consent of both parties.

**11.4 Independent Contractor**
Neither party shall, for any purpose, be deemed to be an agent of the other party and the relationship between the parties shall only be that of independent contractors. Neither party shall have any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other party, whether express or implied, or to bind the other party in any respect whatsoever.

_EvB –VonBosse_    6

**11.5 Expenses**

In the event a dispute between the parties hereunder with respect to this Agreement must be resolved by litigation or other proceeding or a party must engage an attorney to enforce its right hereunder, the prevailing party shall be entitled to receive reimbursement for all associated reasonable costs and expenses (including, without limitation, attorneys fees) from the other party.

**11.6 Severability**

The parties intend this Agreement to be a legally enforceable instrument. If any provision of this Agreement is held invalid, such invalidity shall not affect other provisions, which can be given effect without the invalid provision, and to this end the provisions of this Agreement are declared severable.

**11.7 Governing Law**

This Agreement shall be governed by and construed under the laws of the State of Washington, excluding its choice of law principles. The parties consent to the exclusive jurisdiction of the state and Federal courts in King County, Washington.

**11.8 Successors, Assignment**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives. Neither party shall have the right to assign or otherwise transfer its rights or obligations under this Agreement except with the prior written consent of the other party, not to be unreasonably withheld.

**11.9 Force Majeure**

In the event that either party is prevented from performing or is unable to perform any of its obligations under this Agreement (other than a payment obligation) due to any Act of God, fire, casualty, flood, earthquake, war, epidemic, destruction of production facilities, riot, insurrection, material unavailability, or any other cause beyond the reasonable control of the party invoking this section, and if such party shall have used its commercially reasonable efforts to mitigate its effects, such party shall give prompt written notice to the other party, its performance shall be excused, and the time for the performance shall be extended for the period of delay or inability to perform due to such occurrences. Regardless of the excuse of Force Majeure, if such party is not able to perform within ninety (90) days after such event, the other party may terminate the Agreement. Termination of this Agreement shall not affect the obligations of either party which exist as of the date of termination.

**11.10 Security Interest**

Until the purchase price and all other charges payable to UMCG hereunder have been received in full, UMCG hereby retains and Customer hereby grants to UMCG a security interest in the Products delivered to Customer and any proceeds there from. Customer agrees to promptly execute any documents requested by UMCG to perfect and protect such security interest. In the event of a default by Customer, UMCG may exercise any or all remedies provided under the Uniform Commercial Code or similar statutes or laws enacted in the jurisdiction within which UMCG seeks to enforce its rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date. All signed copies of this Agreement shall be deemed originals.

Signatures

Greg Jenkins

_____

Greg Jenkins
President
UMC Global Inc

Date: 3-3-2020

Eric VonBosse

**SIG SAUER**

Digitally signed by Eric VonBosse
DN: cn=Eric VonBosse, o=SIG SAUER
Inc., ou=Electro-Optics,
email=eric.vonbosse@sigsauer.com,
c=US
Date: 2020.03.04 15:27:26 -08'00'

_____

Eric VonBosse
Manager – Business Intelligence, Electro-Optics Division
Sig Sauer Inc

Date: 5 MAR 20

7